IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) CRIMINAL NO. 18-4172 JAP ) |
| **FERNANDO TOPETE-MADRUENO**, | ) ) |
| Defendant. | ) |

**THE UNITED STATES' MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF THE DEFENDANT'S STATE OF MIND**

This is the Government's motion *in limine* to prohibit Fernando TOPETE-Madrueno ("the defendant") from mentioning or attempting to introduce evidence of economic or a familial hardship as a justification for his possession of illegal narcotics or a firearm. Furthermore, the Government moves to prohibit mentioning or attempting to introduce evidence of necessity or duress unless the defendant proffers testimony that meets the minimum standard as to each element of the defense.

**STATEMENT OF THE FACTS**

In approximately February of 2018, the Federal Bureau of Investigation (FBI) became aware of a Drug Trafficking Organization (DTO) that would eventually be referred to as the Samaniego-Villa DTO (SVDTO). The SVDTO was operating as a narcotics delivery service in Albuquerque. The business model was simple: when a drug dealer needed more drugs, they called the SVDTO, who would then dispatch a driver to deliver the drugs. Primarily through the use of undercover law enforcement officers (UC) making controlled purchases, the FBI identified the key players of the organization and the locations they operated from. During the course of the

investigation, the FBI identified Bladimir ANGULO (a.k.a. Samuel Rodriguez-Velazquez) as one of the drivers for the SVDTO. The FBI also identified a trailer located at 9000 Zuni SE, Trailer D-23, Albuquerque, New Mexico (9000 Zuni) as Angulo's residence that likely also operated as a stash house.

The FBI conduct extensive physical and physical and electronic surveillance of the residence from approximately April 2018 to November 2018. During that time period the location was identified as the place of residence for ANGULO and the defendant. ANGULO was observed on multiple occasions meeting with people with extensive criminal history in drug trafficking. The meetings were suspected drug deals. Several of them actually occurred at 9000 Zuni. During this time frame the FBI saw two cars at the premises: a black Ford Fusion and a black Ford Edge SUV. The Ford Fusion was used by ANGULO and the Edge was used by the defendant.

On July 31, 2018, the FBI used a controlled source (CS) to arrange for a UC to purchase 1 ounce of methamphetamine and 3 ounces of heroin from the SVDTO. A time and place were arranged for the delivery of the drugs to the UC. The FBI established surveillance on 9000 Zuni before the scheduled delivery and observed ANGULO's Ford Fusion parked there along with the Ford Edge used by the defendant. Just prior to the scheduled delivery time, the surveillance team observed ANGULO exit the trailer, enter the Ford Fusion, and drive directly to the predetermined delivery location. At the predetermined location, ANGULO exited the vehicle, sold the UC the agreed upon drugs, got back in the vehicle, and drove back to 9000 Zuni after a brief stop at a gas station along the way. Later on, FBI Agents field tested the drugs the UC had purchased. The results were positive for methamphetamine and heroin.

On August 8, 2018, FBI agents, including the UC, called the SVDTO to arrange for the

delivery of four ounces of methamphetamine and three ounces of heroin. After agreeing to the deal, Samaniego-Villa said he needed to call someone to see how long it would take to make the delivery. Samaniego-Villa called back shortly thereafter and said the drugs would be ready for delivery in approximately an hour and a half, and he would call back at that time. Because of this, FBI agents established surveillance at 9000 Zuni.

Shortly surveillance was established, FBI agents observed ANGULO's black Ford Fusion depart the premises of 9000 Zuni. The surveillance team followed the vehicle and confirmed that ANGULO was driving it. ANGULO conducted several errands before meeting up with a black GMC Denali that was registered to Jesus Samaniego-Villa behind a commercial building. Jesus Samaniego-Villa got out of his car, went to the driver's side door of the ANGULO's car, returned to his vehicle, and then both parties left. ANGULO was followed back to 9000 Zuni where agents continued surveillance.

At this time the UC made a follow-up phone call to Sergio Samaniego-Villa. Sergio's wife, Jessica MOYA, answered the phone. She said she would call the UC back and let him know the status of the drugs. She called back a short time later and said the delivery would take place in approximately 15 minutes and set a location for the delivery. Shortly after this call, ANGULO was again seen leaving 9000 Zuni in his black Ford Fusion.

The UC met with ANGULO at the predetermined location with surveillance in tow. ANGULO said he did not have the narcotics on him and moved the meeting location to a car wash down the street. The agents identified this action as an attempt by ANGULO to identify law enforcement. Surveillance followed the UC to the car wash. At the car wash, ANGULO handed the UC the agreed upon drugs and the UC paid him the agreed upon amount.

3

Shortly after this drug sale, Jesus SAMANIEGO-VILLA and other associates of the DTO were arrested. As a result, ANGULO switched vehicles and was seen driving around in a red Pontiac four-door sedan. On November 15, 2018, FBI agents observed that Pontiac parked at 9000 Zuni along with the Ford Edge used by the defendant. ANGULO was seen leaving the premises and travelling to the residence of Robert MEESE. MEESE has a history of drug trafficking, was seen conducting several drug transactions with ANGULO in the preceding months, and had consistent phone contact with ANGULO during the preceding 7 months. ANGULO parked on the street, walked towards MEESE's residence, and stayed there only a brief time before returning to his car. ANGULO left and the agents followed. While the agents were following him, ANGULO conducted several counter-surveillance techniques so the agents terminated the surveillance.

Because the other co-conspirators had been arrested and ANGULO was suspected of dealing drugs out of 9000 Zuni, FBI agents sought a search warrant for 9000 Zuni. On November 19, 2019, FBI TFO Jerrod Pelot applied for and received a warrant to search the premises with the Honorable Judge Jerry H. Ritter. The agents executed the warranted on November 28, 2019.

The trailer at 9000 Zuni has two bedrooms: a north and a south bedroom. During the search the agents found the south bedroom vacant with no furniture or bed. In the north bedroom they found the defendant asleep in his bed. On the nightstand next to the bed they found a bag of a white powdery substance and black handgun. A search of the remainder of the house revealed distribution quantities of methamphetamine and heroin, as well as distribution paraphernalia. After finishing the search of the house the agents went outside and searched the Ford Edge that was parked in the carport on the premises. During the search of the vehicle they found three tinfoil balls of heroin along with documents with the defendant's name on them.

The defendant is charged with four counts by indictment: 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), Possession with the Intent to Distribute 500 Grams and More of a Mixture and Substance Containing Methamphetamine; 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), Possession with the Intent to Distribute Cocaine; 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), Possession with the Intent to Distribute Heroin; and 18 U.S.C. § 924(c), Using, Carrying, and Possessing a Firearm in the Furtherance of a Drug Trafficking Crime.

**ARGUMENT**

**I. REFERENCE TO ECONOMIC OR FAMILIAL HARDSHIP ON THE PART OF THE DEFENDANT IS IRRELEVANT TO HIS POSSESSION WITH THE INTENT TO DISTRIBUTE.**

Any evidence of the defendant's state of mind that does not go towards his intent to possess with intent to distribute methamphetamine is not admissible evidence at trial because it is not relevant to the defendant's guilt or innocence. Relevant evidence has a tendency to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Irrelevant evidence, or that which does not make a fact of consequence more or less probable, is inadmissible. Fed. R. Evid. 402.

In this case, neither category of evidence the United States seeks to exclude are "of consequence to the determination of the action." The elements of possession of a controlled substance with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B and C) are as follows: (1) the defendant knowingly or intentionally possessed a controlled substance as charged; (2) the substance was in the controlled substance charged; (3) the defendant possessed the substance with the intent to distribute it; and, in the case of the charge involving

5

methamphetamine, (4) the amount of the mixture or substance containing methamphetamine was at least 50 grams. 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); *United States v. Dominguez-Rodriguez*, 817 F.3d 1190, 1195 (10th Cir. 2016); 10th Cir. Pattern Jury Instructions 2.85 (2018). The only intent that the United States needs to prove in a §§ 841(a)(1) and (b)(1)(A) trial is that the defendant knew that he possessed some controlled substance. *United States v. De La Torre*, 599 F.3d 1198, 1204 (10th Cir. 2010). The defendant's possible economic of familial hardship has no relevance to the jury determining that intent.

The elements of possession of a firearm in the furtherance of a drug trafficking crime are as follows: (1) the defendant committed the crime of possession of a controlled substance with the intent to distribute, and (2) the defendant possessed a firearm in furtherance of this crime. 18 U.S.C. § 924(c); 10th Cir. Pattern Jury Instructions 2.45.1 (2018). "[I]n the furtherance" requires that the Government prove the purpose for the defendant possessing the firearm was to assist in, promote, accomplish, advance, or achieve the goal of trafficking in drugs. *See United States v. Basham*, 268 F.3d 1199, 1206-08 (10th Cir. 2001); 10th Cir. Pattern Jury Instructions 2.45.1 (2018). A person does not possesses a firearm because of economic or familial hardship; a person would, however, possess a firearm to sell drugs in order to address the economic or familial hardship. That distinction is the difference between the purpose for possessing the firearm and the reason why the defendant possessed a firearm in the first place. The "purpose", i.e., to further the drug trafficking, is relevant; the "why", i.e., he had an economic or familial hardship, is not.

Similarly, the elements of using or carrying a firearm in the furtherance of a drug trafficking crime also require that the Government prove the defendant knowingly used or carried a firearm during and in relation to the drug trafficking crime. 18 U.S.C. § 924(c); *see* 10th Cir. Pattern Jury Instructions 2.45.1 (2018). Again, an economic or familial hardship has no relevance to the

determination of whether or not the defendant knew he used or carried the firearm while committing a drug trafficking crime.

Accordingly, the category of evidence going to the defendant's mental state that the United States seeks to exclude is irrelevant to the crime charged and therefore inadmissible. The first category that the United States seeks to exclude is evidence of a defendant's other reasons to traffic drugs, whatever they may be, including familial and economic. This evidence is not relevant to a defendant's guilt or innocence and is therefore not admissible evidence at trial.

Despite the lack of probative value of any evidence going to the defendant's state of mind, other than to his intent to possess with intent to distribute drugs and further that goal through the possession, use, and carrying of a firearm, the defendant may nevertheless perceive an advantage in placing such evidence before the jury because of the possibility that such evidence may cause the jury to feel sympathy for him. Sympathy, however, is not a proper basis for a verdict. The danger of unfair prejudice to the United States in allowing the defendant to present such evidence heavily outweighs its non-existent probative value. For this reason, it is inadmissible. *See* Fed. R. Evid. 403.

## II. THE DEFENDANT IS NOT ENTITLED TO PRESENT EVIDENCE OF DURESS OR NECESSITY WITHOUT PROFERRING EVIDENCE ADEQUATE TO ESTABLISH THE ELEMENTS OF THAT DEFENSE.

A defendant has no absolute right to present the defenses of duress or necessity at trial. *United States v. Portillo-Vega*, 478 F.3d 1194, 1200-01 (10th Cir. 2007). Unless a defendant presents testimony or a proffer that meets "a minimum standard as to each element of the defense," *id.*, a district court properly exercises its "gate-keeping responsibilities" by precluding the presentation of evidence to the jury on the defense, *id.* at 1202.

Necessity and duress are both affirmative defenses that the defendant has the burden of proving at trial by a preponderance of the evidence. *Id.* at 1197. "While common law historically distinguished between the two, modern cases have blurred the distinction between duress and necessity." *Id.* (quotation and brackets omitted). A duress defense has three elements: "(1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm." *United States v. Scott*, 901 F.2d 871, 873 (10th Cir. 1990). Similarly, a necessity defense requires a defendant to show that "(1) there is no legal alternative to violating the law, (2) the harm to be prevented is imminent, and (3) a direct, causal relationship is reasonably anticipated to exist between defendant's action and the avoidance of harm." *United States v. Al-Rekabi*, 454 F.3d 1113, 1121 (10th Cir. 2006).

Before allowing the defendant to present any evidence related to a defense of duress or necessity to the jury, the Court should require the defendant to proffer or present evidence that satisfies the Court that the defendant can meet each element of such a defense by a preponderance of the evidence. The failure to present sufficient evidence on even one element merits the preclusion of any evidence on the theory at trial. *United States v. Beckstrom*, 647 F.3d 1012, 1016 (10th Cir. 2011).

As with the first category of evidence discussed above, admission of evidence related to duress or necessity − even if indisputably insufficient to establish the defense − may nevertheless be attractive to the defendant because of the potential for such evidence to elicit the jury's sympathy. For this reason as well, the Court should exclude this type of evidence unless the defendant establishes an entitlement to present it.

**CONCLUSION**

The first category of evidence discussed above is not relevant to the determination of the defendant's guilt and the Court should exclude at trial under Fed. R. Evid. 401 and 403. The second category concerns affirmative defenses that the Court should not permit the defendant to raise without first establishing an entitlement to do so. In the interests of promoting a fair and orderly trial and of minimizing the potential for prejudice to either party, the United States requests that this Court issue a pretrial ruling on the admissibility of the above-described evidence.

The filing of this motion in CM/ECF caused a copy to be served electronically on Marshall Ray, counsel for the defendant.

                              Respectfully submitted,

                              JOHN C. ANDERSON
                              United States Attorney

                              *Mark Pfizenmayer*
                              MARK PFIZENMAYER
                              Assistant United States Attorney
                              Post Office Box 607
                              Albuquerque, New Mexico 87103
                              (505) 346-7274