IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                        No. 18-CR-4172- JAP

FERNANDO TOPETE-MADRUENO,

        Defendant.


## <u>MEMORANDUM OPINION AND ORDER</u>

On December 19, 2018, a federal grand jury returned an indictment charging Defendant Fernando Topete-Madrueno[1] with one count of possession with intent to distribute, 50 grams and more of a mixture and substance containing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); one count of possession with intent to distribute a mixture and substance containing heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); one count of possession with intent to distribute a mixture and substance containing cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and one count of possession of a firearm in the furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A)(i). (*See* Indictment, Doc. 14). The charges arise out of a search warrant executed by the Federal Bureau of Investigations (FBI) at 9000 Zuni SE Trailer D-23 in Albuquerque, New Mexico (9000 Zuni) on November 28, 2018. On June 7, 2019, Defendant filed an Opposed Motion to Suppress Evidence (Motion) (Doc. 31), asking the Court to suppress all physical evidence officers seized during the search of the mobile

---

[1] The Indictment also uses Defendant's alias Fernando Gomez-Montez.

home and vehicles located at 9000 Zuni. The United States opposes the Motion, and it is fully briefed.[2]

The Court heard evidence and argument from counsel at a hearing on August 1, 2019. Assistant United States Attorney Mark Pfizenmayer appeared on behalf of Plaintiff, United States of America. Defendant was present in the courtroom and represented by Attorney Marshall J. Ray. Having considered the parties' briefs, arguments, evidence, and relevant case law, the Court will deny Defendant's Motion.

## BACKGROUND

In February 2018, the Federal Bureau of Investigations (FBI) began investigating the Samaniego-Villa Drug Trafficking Organization (SVDTO). The FBI's investigation included surveillance of several individuals and controlled purchases of narcotics using undercover law enforcement officers (UC). During the course of the investigation, the FBI identified Bladimir Angulo (a.k.a. Samuel Rodriguez Velazquez) as an "associate and narcotics transporter" for the SVDTO. The FBI identified 9000 Zuni as Angulo's residence and began conducting visual and electronic surveillance at that location.

On July 31, 2018, law enforcement utilized a confidential human source to arrange for a UC to purchase narcotics from the SVDTO. Shortly before the scheduled delivery, agents observed Angulo exit the trailer at 9000 Zuni, enter a Ford Fusion parked on the property, and drive to the predetermined delivery location. At that location, Angulo sold the UC what was later field tested to be 79.1 grams of heroin and 28.8 grams of methamphetamine. Agents maintained surveillance on Angulo following the controlled purchase and observed him eventually return to 9000 Zuni in the black Ford Fusion.  A black Ford Edge SUV was also parked at 9000 Zuni on that date.

---

[2] *See* UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Response) (Doc. 36); REPLY SUPPORTING OPPOSED MOTION TO SUPPRESS EVIDENCE (Reply) (Doc. 38).

On August 8, 2018, a second controlled purchase was arranged between the UC and the SVDTO. The UC telephonically confirmed a narcotics order with Sergio Samaniego-Villa who told the UC the order would be ready in one and a half hours. Following that telephone exchange, law enforcement observed Angulo leave 9000 Zuni in a black Ford Fusion. After stopping briefly at an apartment, Angulo ran several errands and then was observed meeting with an individual in a black GMC Denali registered to Jesus Samaniego-Villa. Agents then followed Angulo back to 9000 Zuni. The UC conducted a follow up call regarding the narcotics order and was advised that the delivery would be ready in fifteen minutes. Shortly thereafter, agents observed Angulo leave from 9000 Zuni in the black Ford Fusion. The agents followed Angulo to the predetermined meeting location. Once at the location, Angulo advised the UC that he did not have the narcotics and asked the UC to follow him. The UC and the surveillance units followed Angulo to a car wash down the street where Angulo met with the UC and exchanged the agreed-upon drugs for money. After the sale, Angulo left the area in the black Ford Fusion.

In August 2018, law enforcement arrested several members of the SVDTO. Following the arrests, Angulo began driving a red Pontiac four-door sedan. On November 15, 2018, law enforcement again established surveillance at 9000 Zuni. The red Pontiac and a black Ford Edge were parked at the property. Agents observed Angulo leave 9000 Zuni in the red Pontiac. He drove to the residence of Robert Meese, an individual with a history of drug trafficking who agents had observed conducting drug transactions with Angulo in the preceding months. Additionally on November 15, 2018, agents surveilled Defendant, also a resident of 9000 Zuni. Agents followed Defendant to a casino and then followed him back to 9000 Zuni. Defendant drove the black Ford Edge seen parked at 9000 Zuni.

On November 19, 2018, FBI Task Force Officer (TFO) Pelot applied for a search warrant of 9000 Zuni. In the affidavit supporting the warrant, TFO Pelot described his training and experience to include that "individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking in their residences and areas surrounding their residences such as "garages," "carports," and "vehicles parked on or near their property." (*See* Warrant Affidavit, Doc. 31-1, ¶ 3). TFO Pelot additionally stated that in his experience individuals involved in the distribution of controlled substances hide controlled substances in many places including vehicles. (*See* Warrant Affidavit, Doc. 31-1, ¶ 6). The affidavit outlined the details of the two controlled buys between the UC and Angulo, as well as observations from surveillance of the property. (*See* Warrant Affidavit, Doc. 31-1, ¶¶ 15-50). TFO Pelot requested a search warrant "for the residence and premises of 9000 Zuni SE, Trailer D-23, Albuquerque, NM….to include all outbuildings and vehicles parked on the property[.]" (*See* Warrant Affidavit, Doc. 31-1, ¶ 12). On November 19, 2018, United States Magistrate Judge Ritter approved the warrant application with instructions to execute the warrant on or before December 3, 2018. (*See* Warrant, Doc. 31-1).

TFO Pelot testified that on the day the warrant was issued, officers began attempting to locate individual members of the SVDTO to coordinate a collective arrest. However, he stated that agents were not able to immediately execute the warrant due to manpower issues surrounding the Thanksgiving holiday. Two days before agents executed the search warrant at 9000 Zuni, on November 26, 2018, agents began receiving a ping[3] from Angulo's cell phone suggesting that he was frequenting another residence located at 710 Dan Avenue SE, Albuquerque, New Mexico (710 Dan). Agents also observed Angulo at 710 Dan around this date. TFO Pelot testified that he believed agents also observed Angulo at 710 Dan on November 27, 2018, the day before the search

_____

[3] TFO Pelot explained that a "ping" is a global positioning system (GPS) location of a cell phone that gives the proximity of where a particular cell phone is located.

4

warrant was executed at 9000 Zuni. TFO Pelot stated that he believed that last time agents observed Angulo at 9000 Zuni was on November 20, 2018, at which time agents observed Angulo leave from 9000 Zuni to participate in a suspected narcotics transaction with another individual on the west side of Albuquerque.

On November 28, 2018 at approximately 8:30 a.m., agents executed the search warrant at 9000 Zuni. Agents located Defendant asleep in the front bedroom and took him into custody. TFO Pelot testified that agents recognized a handgun on a makeshift shelf less than a foot away from Defendant, as well as baggies of narcotics. The bedroom at the back of the trailer was empty. After searching the residence, agents searched the black Ford Edge parked in the carport at the property. Agents located three tinfoil balls of heroin as well as documents bearing Defendant's name.

While agents were executing the search warrant at 9000 Zuni, another team of agents was conducting surveillance of 710 Dan with the goal of attempting to apprehend Angulo outside the residence. Agents eventually took Angulo into custody at 710 Dan. TFO Pelot testified that, following Angulo's arrest, Angulo confirmed that he was living at 710 Dan. On November 28, 2019, TFO Pelot applied for and was granted a search warrant of 710 Dan. (*See* 710 Dan Warrant Affidavit, Doc. 36-1).

## **LEGAL STANDARD**

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search implicating the Fourth Amendment occurs when the government invades a person's "legitimate expectation of privacy." *Smith v. Maryland,* 442 U.S. 735, 740 (1979). "Suppression of evidence is an appropriate remedy only when the search violates a person's constitutional rights." *United States v. Gama-Bastidas,* 142 F.3d 1233, 1238 (10th Cir. 1998). "The proponent

of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search." *Id.* (internal quotation marks and citation omitted).

**ANALYSIS**

On June 7, 2019, Defendant filed the Motion, asking the Court to suppress all evidence obtained from the search of 9000 Zuni and the Ford Edge parked at the property. Defendant raises three primary issues in his Motion: (1) whether information in the warrant affidavit was stale at the time the warrant was executed, such that it no longer supported probable cause to conduct the search of the residence; (2) whether the search warrant was supported by probable cause that established a nexus between the Ford Edge located on the property and the alleged illegal activity; and finally (3) whether, if the warrant lacked probable cause to conduct the search of 9000 Zuni, the good faith exception to the exclusionary rule applies.

**A. Information Supporting Probable Cause to Search 9000 Zuni Was Not Stale**

"A search warrant must be supported by probable cause requiring 'more than mere suspicion but less evidence than is necessary to convict.'" *United States v. Danhauer,* 229 F.3d 1002, 1005 (10th Cir. 2000) (quoting *United States v. Burns,* 624 F.2d 95, 99 (10th Cir. 1980)). "Probable cause undoubtedly requires a nexus between [the contraband to be seized or] suspected criminal activity in the place to be searched." *United Sates v. Rowland*, 145 F.3d 1194, 1203 (10th Cir. 1998) (alteration in original) (internal quotation marks and citation omitted). "Probable cause to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime." *Rowland,* 145 F.3d 1194, 1204 (10th Cir. 1998). Rather, it requires "additional evidence" linking the residence to the suspected criminal activity. *United States v. Biglow,* 562 F.3d 1272, 1279 (10th Cir. 2009).

A search warrant remains valid only as long as the information in the affidavit "supporting its issuance provides probable cause to believe the items sought will still be found in the place to be searched at the time the search is conducted." *United States v. Garcia,* 707 F.3d 1190,1194 (10th Cir. 2013). For that reason, information that has grown stale cannot support a finding of probable cause. *United States v. Mathis,* 357 F.3d 1200, 1206-07 (10th Cir. 2004). The determination of timeliness does not depend simply on the number of days that have elapsed between the facts relied on and the issuance of the warrant. *United States v. Snow,* 919 F.2d 1458, 1460 (10th Cir. 1990). Rather, "whether information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *United States v. Mathis,* 357 F.3d 1200, 1207 (10th Cir. 2004) (quotation omitted). "[O]ngoing and continuous activity makes the passage of time less critical when judging the staleness of information upon which a search warrant is based[.]" *United States v. Roach,* 582 F.3d 1192, 1201 (10th Cir. 2009) (quotation omitted). And, "otherwise stale information may be refreshed by more recent events." *United States v. Cantu,* 405 F.3d 1173, 1178 (10th Cir. 2005).

In *United States v. Snow,* the Tenth Circuit determined that because the defendant was being investigated for running an ongoing, continuous operation to defraud the government, the passage of time between defendant's activities and the warrant application was "less critical" for assessment of staleness. 919 F.2d at 1460. Further, the items sought "were of the type that would be kept for some time given the nature of defendant's activities." *Id.* The Tenth Circuit ultimately concluded that the information in the warrant affidavit was not stale. *Id.* The Tenth Circuit applied *Snow* in the context of ongoing illegal narcotics trafficking and determined that a five-month gap between when police received tips and when the search warrant was obtained did not render the information stale. *United States v. Myers,* 106 F.3d 936, 939 (10th Cir. 1997). Under similar facts,

the Tenth Circuit upheld a search warrant that was based on illegal drug activity that occurred three months before the warrant was obtained, because the affidavit also contained facts demonstrating that the alleged drug activity was ongoing over a considerable period of time. *United States v. Iiland,* 254 F.3d 1264, 1269 (10th Cir. 2001).

In this case, Defendant contends that all of the evidence supporting the search warrant for 9000 Zuni pertained to activities of Angulo that agents observed in August, months before they executed the warrant in November, thereby rendering the information stale. (Doc. 31 at 6). The United States counters that the three-month period between the last controlled purchase involving Angulo and the UC is inconsequential in light of the ongoing criminal activity attributable to Angulo and the SVDTO. (Doc. 36 at 8). The United States further notes that Angulo was seen leaving from 9000 Zuni to meet with a known drug trafficker "mere days" before the warrant was executed. (Doc. 36 at 8).

Considering the totality of the circumstances, the Court concludes that the information in the search warrant supporting probable cause that evidence of drug trafficking would be found at 9000 Zuni was not stale. TFO Pelot's lengthy and detailed affidavit contained cumulative information regarding the SVDTO, which agents had been investigating since February 2018, and Angulo's suspected drug activities with the SVDTO. The affidavit detailed two controlled narcotics purchases in August in which Angulo left from 9000 Zuni moments after an order was placed with the SVDTO and drove to the prearranged meeting locations to complete the transactions. As late as November 15, 2019, just four days before TFO Pelot applied for the search warrant, agents observed Angulo leaving 9000 Zuni to meet with a known drug trafficker associated with the SVDTO. *See United States v. Welch,* 291 F. App'x 193, 199 (10th Cir. 2008) ("Recent evidence of continuing illegal activity may corroborate or refresh dated or stale

information."). This is the type of "ongoing and continuous activity" that makes the passage of time less critical. *United States v. Shomo,* 786 F.2d 981, 984 (10th Cir. 1986).

Moreover, TFO Pelot indicated in the warrant affidavit that, based on his training and experience, individuals involved in drug trafficking often conceal evidence of their criminal activities in and around their residences.[4] (*See* Warrant Affidavit, Doc. 31-1). Many of the items sought by way of the search, drug paraphernalia and packaging materials, books, records, receipts "and other documents relating to transporting, ordering, purchasing, manufacturing and/or distributing controlled substances," "financial documents," "[c]ontrolled substances" and "firearms," Warrant Attachment B, Doc. 31-1, are "of the type that would be kept for some time given the nature of [the SVDTO and Angulo's] activities," *Snow,* 919 F.2d at 1460. The Court finds that information contained in TFO Pelot's affidavit upon which probable cause to search 9000 Zuni was based was not impermissibly stale. *See Shomo,* 786 F.2d at 984 ("where the property sought is likely to remain in one place for a long time, probable cause may be found even though there was substantial delay between occurrence of the event relied on and the issuance of the warrant"); *see also United States v. Iiland,* 254 F.3d 1264 (10th Cir. 2001) (ongoing drug trafficking activity over three-month period not stale).

"Probable cause [also] becomes stale when new information received by the police nullifies information critical to the earlier probable cause determination before the warrant is executed." *United States v. Dalton,* 918 F.3d 1117, 1128 (10th Cir. 2019). Defendant argues that by the time agents executed the search warrant, they had information that Angulo had moved to another location, thereby invalidating probable cause to search 9000 Zuni. (Doc. 31 at 6). He maintains that "[t]he presence of Angulo was not only critical – it was the only basis for the search warrant

---

[4] The Court will address Defendant's argument pertaining to Angulo's change of residence from 9000 Zuni to 710 Dan below.

against 9000 Zuni." (Doc. 38 at 4). The United States asserts that agents did not know Angulo had moved at the time they executed the search warrant, but that regardless, such knowledge would not have nullified probable cause to search 9000 Zuni. (Doc. 36 at 11). This is because the warrant was intended to search for "evidence related to a larger DTO," and there was no reason to believe Angulo had taken all of the evidence with him when he moved. (Doc. 36 at 11).

The Court concludes that probable cause to search 9000 Zuni was not nullified by information that Angulo began frequenting 710 Dan after the warrant issued but before it was executed. Agents first established surveillance at 9000 Zuni and observed Angulo coming from and returning to the trailer at 9000 Zuni on July 31, 2018. (*See* Warrant Affidavit, Doc. 31-1, ¶ 22). As late as November 20, 2019, the day after the warrant was issued, agents observed Angulo leave from 9000 Zuni to conduct a drug transaction. On November 26, 2018, agents received a cell phone ping at 710 Dan and were able to observe Angulo at 710 Dan on November 26, 2018 and November 27, 2018, suggesting that Angulo was frequenting that location. TFO Pelot testified that by November 28, 2018, the date the search warrant was executed, agents believed that there was "a high probability" that Angulo could be found at 710 Dan. However, he also credibly testified that it was not until agents entered 9000 Zuni and found the back bedroom completely empty and then later received confirmation from Angulo himself that 710 Dan was his residence, that agents knew that Angulo had moved. Angulo's participation in two controlled purchases created a reasonable inference that evidence of drug trafficking would be located at 9000 Zuni, Angulo's known residence for months leading up to the execution of the search warrant.

Furthermore, the search warrant for 9000 Zuni was not based solely on Angulo. Rather, TFO Pelot stated that Angulo was part of a larger DTO engaged in ongoing criminal activity. TFO Pelot described that the "SVDTO operates as a dispatch narcotics delivery service," in which

narcotics dealers place an order via telephone with Samaniego-Villa who then dispatches a driver for delivery. (*See* Warrant Affidavit, Doc. 31-1, ¶¶ 15-19). It was not unreasonable to believe there was a high likelihood that records, or other evidence of criminal activity could be located at 9000 Zuni even in Angulo's absence. *See, e.g., Santistevan v. City of Colorado Springs,* 983 F. Supp. 2d 1295, 1314-15 (D. Colo. 2013) (rejecting plaintiff's argument that because the target of the drug trafficking investigation was in jail through the execution of the warrant the likelihood that he continued to use the subject premises to store drugs was reduced because the target was part of a larger conspiracy engaged in ongoing criminal activity).

In summary, given the nature of the criminal activity, the length of the activity, and the items sought, the Court concludes that the information supporting the search warrant for 9000 Zuni was not stale at the time TFO Pelot presented his application to Judge Ritter, nor was probable cause vitiated prior to execution of the warrant.

**B. Defendant Does Not Have Standing to Challenge the Search of the Ford Edge**

"'Fourth Amendment rights are personal, and, therefore, a defendant cannot claim a violation of his Fourth Amendment rights based only on the introduction of evidence procured through an illegal search and seizure of a third person's property or premises." *United States v. Mosley,* 743 F.3d 1317, 1322 (10th Cir. 2014) (quoting *United States v. DeLuca,* 269 F.3d 1128, 1131 (10th Cir. 2001)). A defendant can challenge a search under the Fourth Amendment if "the defendant manifested a subjective expectation of privacy in the area searched and [if] society is prepared to recognize that expectation as objectively reasonable." *United States v. Eckhart,* 569 F.3d 1263, 1274 (10th Cir. 2009) (internal quotation marks and citation omitted).

To establish standing to challenge the search of the Ford Edge, Defendant bears the burden of showing a "legitimate possessory interest in or [a] lawful control over the car." *United States v.*

*Valdez Hocker,* 333 F.3d 1206, 1209 (10th Cir. 2003) (internal quotation marks omitted) (alteration in original). Under established law, an individual who is the vehicle's driver but not the registered owner "plainly ha[s] a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle" if the driver establishes "that he gained possession from the owner or someone with authority to grant possession." *Valdez Hocker,* 333 F.3d at 1209 (internal quotation marks and citation omitted). "[H]owever, a defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself." *Id.* Instead, courts consider: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle." *Id.* (internal quotation marks and citation omitted).

The United States contends that Defendant does not have standing to challenge the search of the Ford Edge because he is not the vehicle's registered owner and has not provided evidence that he had permission to use the vehicle from the vehicle owner. Defendant does not dispute that he is not the registered owner of the Ford Edge and that the vehicle is instead registered to Jesus Manuel Loya. (*See* Certificate of Vehicle Registration, Gov. Ex. 2, Doc. 36-2).

Defendant did not address his standing to challenge the search of the Ford Edge in his briefing. However, at the hearing Defendant's counsel argued that TFO Pelot's testimony supported a reasonable inference that Defendant had permission to use the vehicle. For example, Officer Pelot testified that agents had initially observed Jesus Samaniego-Villa driving the Ford Edge. But around April 2018, Samaniego-Villa began driving a different vehicle and shortly thereafter Defendant was the only person agents observed operating the Ford Edge. Also, when Defendant was arrested  he asked agents to return the vehicle to another individual.  Finally, TFO

Pelot testified that agents located documents with Defendant's name on them in the vehicle during the search. Nevertheless, "mere possession of the car and its keys does not suffice to establish a legitimate possessory interest." *Id.* Defendant presented no testimony or other evidence regarding how he came into possession of the Ford Edge or his relationship, if any, to the registered owner Jesus Manuel Loya. The Tenth Circuit has made clear that "[a] defendant does not have standing to contest a search where he does not establish a link between himself and the registered owner." *Eckhart,* 569 F.3d at 1275. The burden to establish standing is Defendant's, and he has not met his burden. As such, Defendant does not have standing to assert a Fourth Amendment interest in the Ford Edge.

### C. The Search the Ford Edge Was Valid

Even if Defendant had standing to challenge the search of the Ford Edge, the Court concludes that the search of the Ford Edge would still be valid. "[F]or probable cause to exist there must be a nexus between the contraband to be seized or suspected criminal activity and the place to be searched." *United States v. Dutton,* 509 F. App'x 815, 817 (10th Cir. 2013). Defendant contends that the affidavit expressly identified the Ford Fusion once located at 9000 Zuni as the vehicle involved in the two controlled purchases but offers no evidence that the Ford Edge was used for criminal activity. (Doc. 31 at 8-9). Citing to caselaw, the United States argues that "[a] search warrant authorizing a search of a certain premises generally includes any vehicles located within its curtilage if the objects of the search might be located therein." (Doc. 36 at 13, citing to *United States v. Gottschalk,* 915 F.2d 1459, 1461 (10th Cir. 1990)).

The Tenth Circuit has held that the scope of a search warrant for a premises, "include[s] those automobiles either actually owned or under the control and dominion of the premises owner or, alternatively, those vehicles which appear, based on objectively reasonable indicia present at

the time of the search, to be so controlled." *Gottschalk,* 915 F.2d at 1461. And in *United States v. Mitchell,* 503 F. App'x 751, 754-55 (11th Cir. 2013), cited by the United States in its Response, the Eleventh Circuit found the defendant's argument that officers lacked probable cause to search vehicles parked in the driveway of his property unavailing for three reasons. *Mitchell,* 503 F. App'x at 755. First, the search warrant explicitly authorized officers to search vehicles parked on the curtilage of the defendant's property. *Id.* Second, the court stated that because probable cause existed to believe a search of the residence would yield drug-related evidence, the warrant permissibly authorized the search of vehicles on the property. *Id.* Finally, the court noted that "a search of vehicles located on the premises to be searched is valid even if the search warrant had been silent as to the vehicles." *Id.*

Other courts have held under similar circumstances that a search of vehicles located on the subject premises of a search warrant is authorized by the warrant. *See, e.g., United States v. Patterson,* 278 F.3d 315, 318 (4th Cir. 2002) ("Where a warrant authorizes the search of an entire property or premises, the scope of the warrant includes automobiles on the property or premises that are owned by or are under the dominion and control of the premises owner or which reasonably appear to be so controlled."); *United States v. Bulgatz,* 693 F.2d 728, 730 n. 3 (8th Cir. 1982) (rejecting defendants' challenge to search of a car parked on the property and finding that "[t]he fact that affiant had crossed out the words 'motor vehicle' on the search warrant application did not preclude search of an automobile on the premises, but only indicated that the general object of the search was the 'premises,' not the automobile"); *United States v. Napoli,* 530 F.2d 1198, 1201 (5th Cir. 1976) (finding that a search of a camper was authorized by a warrant to search the residence where the camper was parked in the driveway of the subject premises and the object of the search was movable contraband).

Considering the totality of the circumstances surrounding the search at issue, it was reasonable for agents to assume that the Ford Edge parked at 9000 Zuni was under the control of Defendant, who resided at the subject premises.[5] TFO Pelot notes in the warrant affidavit that Defendant resides at the property, and testified during the suppression hearing that since April 2018, Defendant has been the sole user of the Ford Edge. Additionally, as in *Mitchell*, here the warrant specifically authorizes the search of vehicles parked on the property. (*See,* Warrant Attachment A, Doc. 31-1). Although the warrant does not provide a detailed description of the vehicles, in the warrant affidavit TFO Pelot notes that when surveillance was established a black Ford Fusion and a black Ford Edge SUV were parked at the property. (*See* Warrant Affidavit, Doc. 31-3, ¶ 22). TFO Pelot relates that evidence of drug trafficking is often found in residences and areas surrounding residences to include garages and vehicles. (*See* Warrant Affidavit, Doc. 31-3, ¶¶ 3, 6, 11). And in this case, TFO Pelot detailed two controlled purchases originating from 9000 Zuni and reported that officers had reason to believe that 9000 Zuni was a possible stash house for the SVDTO, an organization that uses a series of couriers like Angulo to transport and deliver drug orders. (*See* Warrant Affidavit, Doc. 31-3, ¶¶ 15-16, 49). The Court concludes that the search of the Ford Edge did not violate the Fourth Amendment and the evidence found as a result should not be excluded at trial.

## D. The Good Faith Exception

The Tenth Circuit has held that suppression of evidence is not necessary where an officer relied in good faith on a duly authorized search warrant, even though the supporting affidavit did not establish probable cause. *United States v. Beck,* 139 F. App'x 950, 954-55 (10th Cir. 2005).

---

[5] It is not clear to the Court who was the legal owner of the trailer located at 9000 Zuni, or whether the property was being leased. However, the Tenth Circuit has read *United States v. Gottschalk*, 915 F.2d 1459 (10th Cir. 1990) to "encompass vehicles actually or apparently owned or controlled by long-term residents who exercise possessory ownership of the premises." *See United States v. Hohn,* 606 F. App'x 902, 909 (10th Cir. 2015).

The test to determine whether the good faith exception should apply "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Leon*, 468 U.S. 897, 923, n. 23 (1984). Because the Court finds that the searches of 9000 Zuni and the Ford Edge did not violate the Fourth Amendment, it does not reach the United States' alternative argument that the good faith exception applies to this case.

IT IS THEREFORE ORDERED THAT Defendant Fernando Topete-Madrueno's Opposed Motion to Suppress (Doc. 31) is DENIED.

SENIOR UNITED STATES DISTRICT COURT JUDGE